# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 4:19-CR-00686-LPR |
| ) | |
| BRANDON CHARLES MARTIN ) | |

## ORDER

Defendant Brandon Charles Martin moves to suppress evidence obtained as a result of a traffic stop that he contends was illegal.[1] The Motion is DENIED.

*Factual Findings*[2]

On July 26, 2019, Officer Sterling Pruitt of the Bryant Police Department was traveling eastbound in a marked police car on Interstate 30 ("I-30") near mile-marker 123.[3] At that location of I-30, there are three eastbound lanes.[4] Officer Pruitt was in the middle lane.[5] A blue Dodge

---

[1] Def.'s Mot. to Suppress (Doc. 39).

[2] At the suppression hearing the Court conducted on Defendant's Motion, the government introduced two video recordings of the traffic stop as Exhibit 2. Aug. 19, 2021 Hr'g Tr. at 2. The videos appear to be identical except for the fact that one of the videos is in wide angle. Also, the videos do not have a time stamp. When the Court cites to Exhibit 2, it will use the time as it appears on the media player.

[3] Ex. 1 (Police Report) to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-1) at 3; Def.'s Mot. to Suppress (Doc. 39) at 1; Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49) at 1. At the suppression hearing, the government presented testimony from Officer Pruitt. Aug. 19, 2021 Hr'g Tr. at 4–36. Officer Pruitt has eight years of law enforcement experience. *Id.* at 5. After working for four years as an officer for the Maumelle Police Department, Officer Pruitt became an officer for the Bryant Police Department in September of 2016. *Id.* He retired from law enforcement in January 2020. *Id.* At the suppression hearing (but not in his moving papers), Defendant suggested that Officer Pruitt, a city police officer, did not have the permission of the Arkansas State Police to patrol the Interstate. *See* Aug. 19, 2021 Hr'g Tr. at 29–30 (eliciting testimony attempting to show that the Bryant Police Department's authorization to patrol the Interstate had expired). Officer Pruitt testified that he was authorized to patrol I-30 and regularly initiated traffic stops on the Interstate. *Id.* at 10, 22. The Court finds Officer Pruitt's testimony credible and concludes that Officer Pruitt was so authorized. Officer Pruitt's testimony is consistent with the factual record, which shows that, in 2008 and 2010, the Arkansas State Police authorized the Bryant Police force to conduct general patrols on the interstate in the area at issue. *Id.* at 30. Contrary to Defendant's position, the stop was the result of such generalized patrolling. And Defendant's suggestion that the 2010 authorization expired is without a factual basis in the record.

[4] Aug. 19, 2021 Hr'g Tr. at 7.

[5] *Id.*

Charger traveling in the left lane (the lane closest to the concrete divider) passed Officer Pruitt.[6] The left lane's outer boundary is marked with a yellow line.[7] Defendant was driving the Charger.[8]

Officer Pruitt immediately took notice of the Charger because his experience was that "people don't like to pass police officers."[9] Officer Pruitt testified that, "as the vehicle passed me, I noticed that it did not have a functioning license plate light[,] which is required by Arkansas statute."[10] Officer Pruitt also said that the Charger slowed down after passing Officer Pruitt's patrol car.[11] Officer Pruitt testified that "the vehicle was traveling upon and across—what would be the centerline."[12] To Officer Pruitt, crossing the centerline constituted a traffic violation.[13] Officer Pruitt testified as to his belief that "crossing" included driving on any part of the centerline.[14] "[B]ased on these two things" (the malfunctioning license-plate light and the vehicle "crossing" the centerline), Officer Pruitt activated his emergency lights to initiate a traffic stop.[15] Officer Pruitt did not observe any other legal infractions.[16]

Officer Pruitt's patrol car was equipped with an MVR system, which visually recorded Officer Pruitt's patrol car trailing the Charger for forty-four seconds before Officer Pruitt engaged his emergency lights.[17] Officer Pruitt could not definitively say whether he manually turned on

---

[6] *Id.*

[7] Ex. 2 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-2) at 00:01.

[8] Aug. 19, 2021 Hr'g Tr. at 11.

[9] *Id.* at 11, 23.

[10] *Id.*; Ex. 1 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-1) at 3.

[11] Aug. 19, 2021 Hr'g Tr. at 10.

[12] Aug. 19, 2021 Hr'g Tr. at 7; Ex. 1 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-1) at 3. As discussed below, video footage and Officer Pruitt's testimony revealed that no part of the Charger ever completely crossed over the centerline onto the shoulder of the interstate.

[13] Aug. 19, 2021 Hr'g Tr. at 25–26.

[14] *See id.* at 25.

[15] *Id.* at 7; *see also* Ex. 2 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-2) at 00:44.

[16] Aug. 19, 2021 Hr'g Tr. at 26.

[17] Ex. 2 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-2) at 00:00–00:44. At about the 00:48 mark, the MVR

the MVR system or whether his activating the emergency lights triggered the system.[18]  Officer Pruitt testified that his observations related to the Charger's license-plate-light malfunction occurred before the MVR system began recording the incident.[19]  Officer Pruitt said that the other unlawful conduct (the Charger "crossing" the centerline) is fully depicted in the video that the MVR system captured.[20]

*The first ten seconds* of the video show a blue Dodge Charger traveling in the left lane of the interstate about six car lengths in front of Officer Pruitt's vehicle.[21]  The headlights from Officer Pruitt's vehicle are reflecting brightly off of the Charger's license plate.[22]  This reflection makes it difficult (if not impossible) to tell whether the license-plate light had a malfunction.  As to the Charger's lane position, the car is hugging the yellow line that separates the left lane from the shoulder of the road.[23]  The car's left tires are touching the yellow line, but at no point in this time frame do the tires entirely cross the line onto the shoulder.[24]  The car maintains a steady course (i.e., it does not swerve or make any erratic moves) for these ten seconds.[25]

---

system begins recording audio.

[18] Aug. 19, 2021 Hr'g Tr. at 7–8.  Officer Pruitt testified that the MVR system is activated either manually or automatically when emergency lights are activated. *Id.* at 8.  If emergency lights activate the system, then the recording automatically captures thirty seconds of footage preceding the moment when the lights turn on. *Id.*  This is known as "back recording." *Id.*  Officer Pruitt reasoned that the amount of time the MVR recorded before his emergency lights came on means that he probably manually activated the MVR system. *Id.* at 19.

[19] Aug. 19, 2021 Hr'g Tr. at 35.

[20] *Id.* at 36.

[21] Ex. 2 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-2) at 00:00–00:10.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

*The next twenty seconds* are uneventful.[26] It is still difficult to tell if the car's license-plate light is operational.[27] The car's left tires continue to touch the yellow line. And the car maintains a steady course.[28] Officer Pruitt's vehicle does close the gap between the vehicles during this time period.[29]

*At the thirty second mark*, the car maintains its position in the left lane, and its left tires are still touching the yellow line.[30] About five seconds later, Officer Pruitt's vehicle moves into the left lane directly behind the car.[31] From this time until Officer Pruitt activates his emergency lights (nine seconds), the car's left tires are no longer touching the yellow line and are instead about five inches to the right of that line.[32]

*At the forty-four second mark*, Officer Pruitt activates his emergency lights, and the car briefly swerves to the left, causing the left tires to touch the yellow line again.[33] About five seconds later, the rear-right-turn indicator on the car begins flashing.[34] Over the next thirty-eight seconds, the car moves from the left lane to the far right lane and exits I-30.[35] About thirty seconds later, the car comes to a complete stop in the parking lot of a Citgo gas station.[36] In total, the car took one minute and seventeen seconds to pull over after Officer Pruitt activated his lights.[37] At no

---

[26] *Id.* at 00:11–00:30.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at 00:30.

[31] *Id.* at 00:35.

[32] *Id.* at 00:35–00:44.

[33] *Id.* at 00:45–00:48.

[34] *Id.* at 00:44–00:49.

[35] *Id.* at 00:49–01:27.

[36] *Id.* at 01:27–01:59.

[37] *Id.* at 00:44–01:59.

4

time during the entire video did the car (or even a tire of the car) completely go beyond the yellow line and make contact with the shoulder of the road.

Once the Charger stopped at the gas station, Officer Pruitt got out of his patrol car and walked up to the driver's window.[38] Officer Pruitt made contact with Defendant and a passenger.[39] Officer Pruitt told Defendant that he stopped Defendant because Defendant's vehicle crossed the centerline and because the license-plate light was not working.[40] Defendant explained to Officer Pruitt that he crossed the centerline because the car was out of balance.[41] Officer Pruitt then asked Defendant for his driver's license and proof of insurance.[42] Officer Pruitt testified that Defendant did not have identification on him.[43] Officer Pruitt testified that Defendant said he had a suspended license.[44] Officer Pruitt wrote down Defendant's name and the passenger's name and then returned to his patrol car.[45] Officer Pruitt testified that he ran Defendant's name through various databases and confirmed that Defendant had a suspended driver's license and learned that Defendant was out on bond from the Arkansas Department of Correction.[46]

Officer Pruitt testified that he smelled burnt marijuana as soon as he approached the vehicle.[47] During the initial contact, Officer Pruitt observed "a torch lighter," which he described as "something that can be used, due to its high power, to burn narcotics in a glass device to then

---

[38] *Id.* at 02:05–02:10.

[39] *Id.* at 02:10.

[40] *Id.* at 02:14–02:20. Even from this vantage point, it is not possible to definitively say whether Defendant's license-plate light was functioning.

[41] *Id.* at 02:25–02:36.

[42] *Id.* at 02:37–02:44.

[43] Aug. 19, 2021 Hr'g Tr. at 11.

[44] *Id.* at 12.

[45] Ex. 2 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-2) at 04:00–04:45.

[46] Aug. 19, 2021 Hr'g Tr. at 11.

[47] *Id.*

5

ingest said narcotics."[48]  Officer Pruitt also observed a digital scale, which can be used to weigh illegal narcotics, in the driver's-door pocket.[49]  Officer Pruitt asked Defendant when Defendant last smoked marijuana in the car.[50]  Defendant stated that he had smoked marijuana earlier in the night.[51]  Officer Pruitt then asked Defendant if there was any contraband in the car.[52]  Officer Pruitt also told Defendant that Officer Pruitt saw the digital scale in the car.[53]  Defendant said that there was no marijuana in the car.[54]  Officer Pruitt then told Defendant that Officer Pruitt was "going to toss" the car.[55]  Officer Pruitt asked Defendant if Officer Pruitt was going to find any surprises.[56]  Defendant told Officer Pruitt that his "wife has some weapons."[57]  Officer Pruitt began searching the car.[58]

The search uncovered a "Glock 40 caliber pistol in a leather case;" "an AR15 rifle w/one magazine and a total of 25 rounds;" and various drug paraphernalia.[59]  Defendant was subsequently charged with being a felon in possession of a firearm.  Officer Pruitt also issued traffic citations to Defendant for (1) a suspended driver's license, (2) no license-plate light, and (3) driving left of center.[60]

---

[48] *Id.* at 11–12.

[49] *Id.* at 11.

[50] Ex. 2 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-2) at 09:47.

[51] *Id.* at 09:47–09:57.

[52] *Id.* at 10:25–10:31.

[53] *Id.*

[54] *Id.* at 10:34–10:37.

[55] *Id.* at 11:09.

[56] *Id.* at 11:11.

[57] *Id.* at 11:15.

[58] *Id.* at 12:01.

[59] Ex. 1 to Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49-1) at 3.

[60] Aug. 19, 2021 Hr'g Tr. at 13.

*Conclusions of Law*

Defendant argues that (1) the stop violated the Fourth Amendment because there was no probable cause that a traffic violation occurred, and (2) any contraband found as a result of the subsequent search should be suppressed as fruits of the poisonous tree.[61]

"Because a traffic stop is a seizure within the meaning of the Fourth Amendment, it must be reasonable to pass constitutional muster."[62]  "A traffic stop generally must be supported by 'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring . . . .'"[63] Seeing a traffic violation more than meets this standard.  Indeed, "'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'"[64]  "This is true even if a valid traffic stop is a pretext for other investigation."[65]

With respect to Defendant driving on the yellow line, the United States argues that Officer Pruitt had probable cause to believe that Defendant violated Arkansas Code Annotated section 27-51-302(1).[66]  That statute says that "[a] vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that movement can be made with safety . . . ."[67]  According to the United States, "the video clearly

---

[61] Aug. 19, 2021 Hr'g Tr. at 56.

[62] *United States. v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) (internal citation omitted) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).

[63] *United States v. Cox.*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005) (quoting *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004))), *abrogated on other grounds by Rodriguez v. United States*, 575 U.S. 348 (2015).

[64] *Id.* (quoting *Martin*, 411 F.3d at 1000 (quoting *Fuse*, 391 F.3d at 927)), *abrogated on other grounds by Rodriguez*, 575 U.S. 348.

[65] *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002).

[66] Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49) at 2.

[67] Ark. Code Ann. § 27-51-302(1).

7

shows the vehicle crossing and driving on the [center]line on the left side of the interstate highway," which "constituted a traffic violation under Arkansas law."[68]

The United States points to *United States v. Pulliam* as establishing that Defendant's driving here violated the statute by crossing the yellow line.[69] In *Pulliam*, the Eighth Circuit said that Pulliam violated Arkansas Code Annotated section 27-51-302 when the vehicle Pulliam was driving "cross[ed] the fog line, the solid white line that separates the shoulder from the highway, twice."[70] But the *Pulliam* court did not elaborate on what constituted crossing the line.[71] The Court is skeptical of the United States' interpretation of the statute. The statute does not set out the bounds of a single lane. It is certainly plausible that football or basketball rules apply and a vehicle is "out of bounds" when it touches the line. But it is just as plausible that a car is "in bounds" if its tires are on but not over the centerline.[72] The Court has found no Arkansas cases delineating where the "single lane" ends.[73]

If the Court were forced to construe the statute in light and apply it to Defendant's actions, the Court would likely find that no violation occurred. But the Court need not determine whether Defendant violated the statute to resolve Defendant's Motion to Suppress. This is because the Eighth Circuit makes clear "that the determinative question is not whether a traffic violation

---

[68] Gov.'s Resp. to Def.'s Mot. to Suppress (Doc. 49) at 2.

[69] *Id.*

[70] *United States v. Pulliam*, 265 F.3d 736, 738–740 (8th Cir. 2001).

[71] The same is true for the unpublished case the United States cites. *See* Gov.'s Resp. to Def.'s Mot. to Dismiss (Doc. 49) at 2 (citing *United States v. Barberena-Jimenez*, 77 F.3d 486, 1996 WL 83002, at *2–3 (8th Cir. 1996) (per curiam) (unpublished)). In *Barberena-Jimenez*, Barberena "crossed over the solid white line," which "indicate[d] that Barbarena did not maintain his automobile in a single lane of traffic." *Barberena-Jimenez*, 1996 WL 83002, at *3.

[72] *Cf.* OFFICIAL BASEBALL RULES 2 (Tom Lepperd ed., 2019) (stating that "[t]he infield and outfield, including the boundary lines, are fair territory and all other area is foul territory"). In tennis, as long as the ball touches the line, it is in. In golf, if the slightest sliver of the ball is touching the out of bounds line, it is in. The Court takes judicial notice of the rules of the sports mentioned above. *See* Fed. R. Evid. 201.

[73] Ark. Code Ann. § 27-51-302(1).

8

actually occurred, but 'whether an objectively reasonable officer could have formed a reasonable suspicion that [the driver] was committing a code violation.'"[74] Moreover, the Supreme Court has held that an officer's reasonable "mistake of law can nonetheless give rise to the reasonable suspicion necessary" to uphold a seizure.[75] "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection."[76]

It is possible that the United States' interpretation of the statute is right. If that's the case, then the video definitively establishes that Defendant violated Arkansas Code Annotated section 27-51-302(1), which means that Officer Pruitt had probable cause to stop Defendant's vehicle. Even if the United States' interpretation is wrong, though, Officer Pruitt at worst made a reasonable mistake of law. The statute requires vehicles to "be driven as nearly as practical entirely within a single lane."[77] Given the varying reasonable interpretations for what constitutes a violation of the statute, a reasonable officer could believe that a vehicle whose tires touched and continued to ride on the yellow line was not within a single lane and was thus violating the statute. Officer Pruitt did believe this. Officer Pruitt had probable cause to believe that Defendant committed a traffic violation.

No Fourth Amendment violation occurred here. Because the Court concludes that Defendant's driving gave rise to a valid traffic stop, it need not address whether the Officer had probable cause to believe the license-plate light was defective. Defendant's only grounds for

---

[74] *Cox*, 922 F.3d at 709.

[75] *Heien v. North Carolina*, 574 U.S. 54, 57 (2014).

[76] *Id.* at 60–61 (internal quotations omitted).

[77] Ark. Code Ann. § 27-51-302(1).

9

suppression are predicated on what turns out to be a lawful traffic stop. Therefore, Defendant's Motion to Suppress is denied.

## Conclusion

Defendant's Motion to Suppress is DENIED.

IT IS SO ORDERED this 30th day of August 2021.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE